**SIGNED THIS: February 28, 2019**

_____
**Mary P. Gorman
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 17-90985 |
| AARON GILLISON, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| BETH YORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 17-09025 |
| | ) | |
| AARON GILLISON, | ) | |
| | ) | |
| Defendant. | ) | |

# O P I N I O N

Before the Court for decision after trial is a complaint to determine the dischargeability of a debt allegedly owed by Aaron Gillison to Beth York. Because

Beth York established by a preponderance of the evidence that Aaron Gillison is indebted to her and that the debt was incurred through false representations, the debt will be excepted from Aaron Gillison's discharge.

## I. Factual and Procedural Background

Aaron Gillison ("Debtor") filed his voluntary petition under Chapter 7 on September 9, 2017. On his Schedule D: Creditors Who Have Claims Secured by Property, the Debtor listed the Plaintiff, Beth York, as a secured creditor in the amount of $76,995. He did not, however, identify any collateral securing the debt; he also did not describe the debt as contingent, unliquidated, or disputed.

Beth York commenced this adversary proceeding by filing a one-count complaint alleging that, on July 16, 2016, she and Applewood Builders, LLC ("Applewood"), a company owned by the Debtor, entered into a contract for the construction of a single-family home. Pursuant to the contract, Ms. York was obligated to pay Applewood in installments for work completed on the home, and Applewood was obligated to pay the subcontractors hired to assist in the construction. Ms. York asserted that she paid all invoices received from Applewood in full, with the final invoice being paid on March 24, 2017. She had believed that, when she paid Applewood, the Debtor was using those payments to pay subcontractors and material suppliers.

Ms. York alleged that, after paying Applewood most of what was owed on the contract, she received communications from several subcontractors and material suppliers informing her that Applewood had not paid for services and materials provided by them. Ms. York was then required to make payments totaling $76,960

to remove liens for labor and materials used in the construction of her home. She also claimed to have paid an additional $6452 to other contractors to complete construction. She alleged that she was forced to make these extra payments due to fraudulent misrepresentations made by the Debtor when he requested her periodic payments to Applewood and his fraudulent conduct in not using her payments to pay the subcontractors and material suppliers who provided goods and services for her home construction. Ms. York also alleged that there was such a unity of interest and ownership between the Debtor and Applewood that they should be considered a single entity and that the Debtor should be held personally liable for her losses.

At the trial held on December 17, 2018, the Debtor was called as a witness. The Debtor testified that he had been a general contractor for about 13 to 14 years and had constructed approximately 12 to 15 homes. He had done business using several different business entities, including Applewood, which the Debtor formed on April 12, 2016. The Debtor testified that, while operating as Applewood, he met with Beth York several times to discuss building her home, and, on June 16, 2016, Applewood entered into a contract with Ms. York. The Debtor identified the contract and testified that the total contract price, including costs of labor and materials, was $272,000. He stated that the contract provided for Ms. York to make an initial payment and then biweekly payments. He admitted that, pursuant to the contract, payments made by Ms. York were to be used to pay for the costs of labor and materials. The Debtor further testified that he never had a problem with Ms. York making her payments and that she had paid every invoice in full. He admitted that he had not paid several subcontractors and material suppliers

who had provided goods and services for the construction of Ms. York's home.

The Debtor recalled receiving a phone call at some point from Ms. York regarding the nonpayment of a subcontractor but could not remember the explanation he provided to her. He also identified a letter from Ms. York, dated May 24, 2017, in which she expressed her disappointment with the delayed progress in completing the construction of her house, informed the Debtor that several subcontractors and material suppliers had contacted her for payment, and notified him that she had paid approximately $16,000 to a subcontractor, J.B. Eskers & Sons ("J.B. Eskers"). The Debtor could not recall if he responded to the letter but speculated that he had told Ms. York that he would make things right.

The Debtor testified that he knew what lien waivers were but said that he did not fully understand the mechanics of how they worked. He assumed that he had discussed lien waivers with Ms. York because he had to sign partial lien waivers at the request of Ms. York's bank, Prairie State Bank. He could not remember if he discussed subcontractor lien waivers with Ms. York.

The Debtor also testified about Applewood, explaining that he and his wife were the only members and officers of the company. Applewood had its own bank account, separate from that of the Debtor and his wife. The Debtor stated that Applewood's records were maintained either in paper form or on his personal laptop and kept at a building located in Arcola, Illinois, owned by his wife. On April 26, 2018, that building collapsed, destroying all of Applewood's records. No back-up records were kept. After the building collapsed, the remaining Applewood equipment was kept at the Debtor's residence, also owned by his wife. He admitted that he used his personal truck for Applewood business and had placed

an Applewood decal on the vehicle. He said that Applewood was involuntarily dissolved in October 2017 and any money in the company bank account after the dissolution went towards paying debts and his bankruptcy attorney.

During questioning by his own attorney, the Debtor said that Applewood had been started with a $30,000 contribution by his wife, which he believed was sufficient capitalization for the business. He said that he never co-mingled personal funds with Applewood funds and did not divert Applewood funds for his personal use. He denied that he had any intent to defraud Beth York.

Beth York testified and said she entered into a contract with Applewood for the construction of her home. She had been referred to Applewood and the Debtor by the owner of a lumber company. Prior to finalizing the contract, she met with the Debtor several times to discuss the terms. In addition to discussing the terms of their contract and upon recommendation from Prairie State Bank, Ms. York requested partial lien waivers from the Debtor for each of her payments. Ms. York testified that she also asked the Debtor to get lien waivers from the subcontractors. No subcontractor lien waivers, however, were ever provided. She identified the invoices and partial lien waivers she had received from Applewood; those documents established that the payments made by her to Applewood from June 2016 through March 2017 totaled $254,353.33.[1]

Ms. York said that she believed that the Debtor was using the money she was paying to Applewood to pay subcontractors and material suppliers. But in December 2016, she was notified of a lien placed on her house by J.B. Eskers. In

---

[1] The documents included an invoice for the digging and installation of a well that Ms. York had paid directly. The amount of that invoice is not included in the total because the cost of the well installation was expressly excluded from the Applewood contract.

response, Ms. York contacted the Debtor and asked him if J.B. Eskers had been paid in full. She testified that the Debtor told her that he was taking care of the problem and that she relied on the Debtor's representation. At some point after that conversation, however, Ms. York found out that the Debtor had not paid J.B. Eskers in full. She eventually reached an agreement with the Debtor whereby she paid the $16,764.95 owed to J.B. Eskers and the Debtor agreed the payment would be credited against the amounts remaining due on the contract.

Ms. York testified that, in May 2017, she began receiving communications from other subcontractors and material suppliers complaining that they had not been paid. She contacted the Debtor, and he told her that he had not made the payments because he had used some of the money she paid to Applewood for other projects. At the request of Prairie State Bank, she asked the Debtor to sign a contractor's affidavit to release her from liability for the nonpayment of subcontractors and material suppliers. Ms. York testified that the Debtor said he would sign the affidavit but never did. Subsequently, she wrote a letter to the Debtor on May 24, 2017, informing him of her intent to cancel the contract due to the delay in completing her home and the Debtor's failure to pay subcontractors and material suppliers.

Ultimately, the Debtor did not complete construction of the home. Ms. York testified that she paid the unpaid subcontractors and material suppliers, had to hire two additional contractors to finish the work on her home, and had to dispose of a substantial amount of unused materials left on her property. She identified receipts and lien waivers she received from the subcontractors and material suppliers that she paid directly. Those payments totaled $76,960.62, including the

$16,764.95 paid to J.B. Eskers.

Rex York, Beth York's father, also testified, stating that he met with the Debtor on several occasions regarding the construction of Ms. York's home, including during the negotiation of contract terms. He specifically recalled telling the Debtor that subcontractor lien waivers were needed. Mr. York testified that the Debtor explained that he personally signed the waivers so that any liability to pay subcontractors would fall on him as the general contractor and not the home owner. Rex York is not in the contracting business and testified that he was not aware that there was a difference between the partial lien waivers that the Debtor was proposing to provide and subcontractor lien waivers. After talking with the Debtor, Mr. York was under the impression that his daughter would not be liable for any subcontractor liens. After finding out that J.B. Eskers had a lien on Ms. York's home, however, Mr. York spoke again with the Debtor. Mr. York testified that the Debtor told him that he had used Ms. York's money for another project and that it would be best to have her pay J.B. Eskers directly. Mr. York told the Debtor that Ms. York had already paid him and would not pay again to satisfy J.B. Eskers. The Debtor then said he would get J.B. Eskers paid.

After later hearing that multiple subcontractors and material suppliers had not been paid, Mr. York again confronted the Debtor. This time, the Debtor told Mr. York that Ms. York had nothing to worry about because he was going to sign a contractor's affidavit that would relieve her of any liability.

Both parties offered arguments, including the citation to relevant authority,

at the close of evidence.[2] The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

Beth York claims that the Debtor personally owes her $76,960.62 because of Applewood's breach of the construction contract for her home. And she asserts that the debt should be found nondischargeable due to the Debtor's false representations. 11 U.S.C. §523(a)(2)(A). To prevail, Ms. York must establish that (1) the debt to her arose through conduct of the Debtor amounting to fraud, false pretenses, or false representations known by the Debtor to be false; (2) the Debtor had an actual intent to deceive her; and (3) to her detriment, she justifiably relied on the false pretense or misrepresentation. *Ojeda v. Goldberg*, 599 F.3d 712, 716-

---

[2] Brenda Lee Gossard, the co-owner of Gossard Painting and Drywall, was also called as a witness. She testified that her company had been hired by the Debtor to do work in 2018 but had not been paid. The Debtor's attorney objected to the relevance of her testimony, and the objection was sustained. Ms. Gossard's testimony was not considered in deciding the issues here.

17, 17 n.4 (7th Cir. 2010); *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 673-76 (7th Cir. 1995). Ms. York bears the burden of proving each element of her cause of action by a preponderance of the evidence. *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997).

The Debtor's defense to the allegations was not clearly presented. But, to the extent he disputed Ms. York's allegations, it appears that the Debtor contends that Applewood's breach of contract should not result in personal liability for him. Thus, the threshold issue of whether the Debtor actually is indebted to Ms. York must be addressed before reaching the issue of dischargeability.

*A. The Debtor Is Personally Liable to Beth York for Applewood's Breach of Contract.*

Applewood entered into a contract with Ms. York to build her home for $272,000. After paying over $255,000 to Applewood, Ms. York was left with an unfinished home, piles of debris and construction materials at the site, and multiple liens on her property. Applewood, without question, breached the contract. The evidence presented established that, by reason of the breach, Applewood is indebted to Ms. York in the amount of $76,960.62—the total of the liens on her property for unpaid materials and labor.

For each payment requested and received by Applewood, the Debtor presented Ms. York with an invoice briefly outlining the work that had been done to justify the payment and a partial lien waiver assuring Ms. York that, to the extent of each payment, no liens would be placed on her property. Nevertheless, liens totaling $76,960.62 were filed against her property, and all of the liens were for labor or materials for which she had already paid Applewood and been assured

that the payments would be properly distributed to material suppliers and subcontractors. Because Ms. York had previously paid Applewood for all amounts claimed by the suppliers and subcontractors and because the Debtor admitted that some of her funds had been diverted to other projects, Ms. York's damages from Applewood's breach is properly calculated as the $76,960.62 that she was required to pay a second time to obtain clear title to her home.

In calculating Ms. York's damages, the Court considered whether the $16,764.95 she paid directly to J.B. Eskers should be included in her damages because both she and the Debtor testified that they had agreed that the amount would be credited against the $272,000 construction price. And even when that amount is added to the amounts she paid Applewood, her total payments credited to Applewood would be less than what she had originally agreed to pay. But to make that adjustment to the calculation, this Court would have to find that Ms. York received the full benefit of her bargain with respect to the construction contract. Her unrebutted testimony was, however, that she did not receive a complete, finished home from Applewood. To the contrary, her letter to the Debtor, dated May 24, 2017, contained a lengthy list of items that still needed to be completed or corrected at the home. Absent any evidence that the home construction was fully completed by Applewood, this Court cannot find that Ms. York owed Applewood any more than she paid it, and she therefore does not owe Applewood any amount against which her direct payment to J.B. Eskers should be credited.

The Debtor did not seriously dispute that Applewood breached the construction contract or that Ms. York was financially damaged by the breach. He

testified that Applewood experienced financial problems and that he used some of Ms. York's payments to pay costs associated with projects other than her home construction. His attorney argued that, unfortunately, construction of Ms. York's home was at the "tail end" of Applewood's existence and that she was stuck with the damages because she was the "last client standing." The Debtor's only defense was to claim that his personal conduct did not rise to the level of wrongdoing necessary to create personal liability or an exception to discharge and that he was shielded from liability because Applewood was a limited liability company.

Under Illinois law, members and managers of limited liability companies are not personally liable "for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 805 ILCS 180/10-10(a). Further, "[t]he failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company." 805 ILCS 180/10-10(c). Illinois courts have held, however, that this broad statutory protection for members and managers of limited liability companies does not prohibit actions to pierce the veil of a limited liability company based on alter ego, fraud, or undercapitalization. *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960 (2008) (reversing the dismissal of a veil-piercing action against a member of a Delaware LLC but finding that the result would be the same under Illinois law); *Dass v. Yale*, 2013 IL App (1st) 122520, ¶¶36, 44, 44 n.7 (sustaining dismissal of action against LLC manager where no allegations to support veil-piercing were made).

This Court has previously considered the issue and held that Illinois law

allows veil-piercing of limited liability companies based on allegations of alter ego, fraud, or undercapitalization. *See Denmar Builders, Inc. v. Suhadolnik (In re Suhadolnik)*, 2009 WL 2591338, at *4 (Bankr. C.D. Ill. Aug. 20, 2009). Other bankruptcy courts construing Illinois law have also come to the conclusion that veil-piercing of limited liability companies is not prohibited by Illinois law. *See, e.g., Brown v. Real Estate Resource Mgmt. LLC (In re Polo Builders, Inc.)*, 388 B.R. 338, 384 (Bankr. N.D. Ill. 2008); *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 863 n.6 (Bankr. N.D. Ill. 2006). Here, Ms. York has alleged that the Debtor personally engaged in fraudulent conduct related to the construction of her home and, accordingly, Applewood's limited liability company veil should be pierced and the Debtor should be held personally liable for Applewood's debt to Ms. York.

Veil-piercing under Illinois law generally requires a finding of such "unity of interest and ownership" between an entity and an individual that their legal separateness "has ceased to exist." *People ex rel. Scott v. Pintozzi*, 50 Ill. 2d 115, 128 (1971) (citations omitted). Further, veil-piercing should be allowed when to do otherwise would "sanction a fraud or promote injustice." *Id.* Illinois courts consider a variety of factors in determining whether a unity of interest or ownership has been established. *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503-04 (2005) (citations omitted). Relevant to the matter here, the factors include inadequate capitalization, insolvency, diversion of assets to the detriment of creditors, and lack of records. *Id.*

Here, the Debtor's own testimony established that Applewood was undercapitalized and most certainly insolvent during the time he was continuing to collect payments from Ms. York. By December 2016, funds that Ms. York had

paid to Applewood for J.B. Eskers' work had been diverted, and a lien had been filed on her property. Applewood apparently had no available capital, and the Debtor therefore had no ability, despite his promises to the contrary, to get J.B. Eskers paid. This same evidence showed that, by December 2016, Applewood was insolvent and unable to pay its bills as they became due. Nevertheless, from January through March 2017, the Debtor, on behalf of Applewood, invoiced Ms. York for an additional $78,568.33 and made written representations to her that the funds would be used to pay suppliers and subcontractors and that she would be relieved of any potential liens to the extent of her payments. The Debtor admitted at trial that Ms. York's funds were diverted to other projects, and his attorney candidly admitted that, as the "last standing client," Ms. York bore the burden of Applewood's financial demise.

Compounding the issues is the lack of any financial records for Applewood. The Debtor says that the records were destroyed when his building collapsed. But that event explains only why Applewood's copies of its bank records were not available. No reason was given why duplicates from Applewood's bank were not obtained and produced. If Applewood actually maintained a separate bank account and if all of Ms. York's funds were deposited into that account, evidence of how the funds were distributed was easily available and might have shed some light on what occurred here. Failure to produce any records suggests that the records would not have been helpful to the Debtor's case. All of the above evidence establishes that there is unity of interest and ownership between the Debtor and Applewood.

Further, to not pierce the veil of Applewood and find the Debtor personally

liable to Ms. York would be to sanction a fraud. As set forth above, by no later than December 2016, the Debtor knew that funds from Ms. York had been diverted and used by him for purposes not associated with her home construction. Thereafter, every time he requested another payment from her, he affirmatively misrepresented that her property would be lien-free to the extent of payments made, and he fraudulently induced her to keep making payments, which he then continued to divert for his other projects. He lied when he said he would take care of J.B. Eskers; he had no money to pay J.B. Eskers and no actual plan to take care of that debt. By his own admissions, it was clear that Applewood was insolvent by late 2016, yet the Debtor fraudulently continued to take money from Ms. York because she was the "last client standing."

By reason of all of the above, the corporate veil of Applewood must be pierced. The Debtor is personally liable to Ms. York for Applewood's debt in the amount of $76,960.62.

*B. The Debtor's Obligation to Beth York is Nondischargeable.*

Having found that the Debtor owes a debt to Ms. York, the elements of her cause of action for nondischargeability must be examined to determine whether she met her burden of proof on each issue. The first element requires proof that the debt arose from fraud, false pretenses, or false representations that the Debtor knew to be false. *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011). Ms. York says that the debt was incurred through false representations, and much of the same evidence that supported piercing the veil of Applewood supports a finding that the Debtor made false representations to Ms. York.

Again, by December 2016 at the latest, the Debtor had begun diverting Ms. York's payments to Applewood for purposes unrelated to her construction contract. He admitted that he knew he was using her money for other projects, but, on four different occasions between January and March 2017, he nevertheless requested payments from her and gave her partial lien waivers assuring her that, to the extent of her payments, her home would be lien-free. Those representations were undeniably false, and the Debtor knew the representations were false because he was the one actually diverting the money. Over that time period, Ms. York paid Applewood $78,568.33, but, by May 2017, $76,960.62 in liens had been filed against her property.

The second element Ms. York must prove is that the Debtor intended to deceive her. *Id.* The Debtor's intent to deceive may be inferred from the false representation. *Kadlecek v. Ferguson (In re Ferguson)*, 222 B.R. 576, 585 (Bankr. N.D. Ill. 1998) (citation omitted). Applewood was failing and obviously was short on funds. The Debtor never fully explained what the other projects were to which Ms. York's funds were diverted. But one can certainly assume that creditors or other customers were pressing the Debtor and that he needed Ms. York's money to respond to those pressures. He admitted as much in his explanation of how he ended up short on her contract, and his attorney's admission that Ms. York was the "last client standing" suggests a "robbing Peter to pay Paul" scheme of intentional deceit. He most certainly knew that if he told Ms. York the truth, she would not have paid him another penny. Ms. York met her burden that the Debtor intended to deceive her.

The final element of proof required is that Ms. York justifiably relied on the

-15-

Debtor's false representations to her detriment. *Field v. Mans*, 516 U.S. 59, 74-75 (1995); *see also Ojeda*, 599 F.3d at 717 n.4. Ms. York testified that she was referred to Applewood and the Debtor by a lumber yard owner and that she met with the Debtor several times before entering into the contract. Following advice from her bank, she expressly discussed lien waivers with the Debtor and received assurances from him that he would provide what was necessary to make sure her home would be lien-free. Ms. York's father followed up and had the same conversations with the Debtor. When Ms. York learned of J.B. Eskers' lien in December 2016, she promptly confronted the Debtor and received absolute assurances from him that he would take care of J.B. Eskers. She had no reason to doubt the Debtor; she was paying Applewood and therefore had reason to believe that Applewood had the funds to pay subcontractors and material suppliers for her home. Her reliance was justifiable.

Ms. York met her burden to establish each element of her cause of action for nondischargeability. The debt will be excepted from the Debtor's discharge entered in this case. Ms. York also asked for fees and costs. She did not provide any authority for an award of fees. The Code provides no basis for an award of fees; the construction contract provided only that, if she did not pay, Applewood's costs of collection could be recovered. Ms. York will be awarded her filing fee as a cost of suit. Fed. R. Bankr. P. 7054(b)(1).

## IV. Conclusion

Applewood breached its construction contract with Beth York, and she proved that she was damaged in the amount of $76,960.33 due to that breach.

Because it was the Debtor's false representations that resulted in the breach and caused the damages Ms. York sustained, he is personally liable for Applewood's debt to her, and that debt will be excepted from his discharge.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###